Our fifth case for this morning is United States v. Wayne Hill. Mr. Brindley. May it please the court, my name is Beau Brindley and I represent the defendant-appellant Wayne Hill. Mr. Hill appeals the district court's ruling on his motion to suppress as well as the district court's ruling on the presentation of expert evidence regarding cell site analysis. What I'd like to talk about this morning is the suppression issue. The first portion to this suppression issue is a question of whether and when Mr. Hill was seized. And I think it's clear from a consideration of all the facts that he was. He was approached by, according to the testimony, he was approached by a casino security person and made it clear he wanted to be left alone. He then stood up to leave, went to the cash out line, and is then surrounded by seven officers and casino personnel, not who are all questioning him, but who are all standing immediately around him. The officer approaches, questions him, Mr. Hill refuses to answer, and when he refuses to answer, he just continues questioning him. He does not- Now the casino security people are private employees of the casino. Some of these people were casino security people. Some of them were and would have been private employees. Some of them are police officers. Well, Lieutenant McCatchney is the police officer- He is. But this begins when a casino employee spots the problem. I think a bill gets stuck or something, and then it moves up across the chain from one casino employee to the next to the next, and then finally he's in line. And McCatchney, who I gather is in uniform, although off-duty, approaches him in this cash out line and basically asks him what's happening. I don't see what's wrong with any of that actually. Well, when he questions him and Mr. Hill doesn't answer, he chooses not to answer, and he goes on questioning him and doesn't tell him the things that the cases talk about, that you're free to leave, you're not under arrest. Why does he have to tell them that in the middle of a giant public place like the casino in Hammond? I think the reason- He could have left the line. Maybe it would have looked a little fishy, but no worse than this story that he found the red money by a lake. I think the reason that he couldn't- Well, I'm not commenting on that particular story here. That comes later in the version of events, so I think the problem is before that. But the answer to the question, I think, is once he feels like he's surrounded by officers, McCatchney knows that's going on. He knows that they're in place. He says he wants them to be in place. And then at that point, I don't think any reasonable person looking around at the situation, seeing officers who appears to be officers or security people over here and over here, police officer coming toward him and asking him a question when he doesn't answer, questions him again, I don't think anyone's going to feel that they're capable of walking away under those circumstances. I mean, if we subtract Lieutenant McCatchney from the situation, there's still a lot of people around him. The casino doesn't want its facilities to be used, quite literally, to launder money. I've never seen a case like this. I didn't even know you could do this. The ingenuity of the thing. I think it may happen more than once. The casino people could certainly have taken care of this themselves, and I suspect would have if Lieutenant McCatchney hadn't been there. And I'm not sure where he gets the right to have them not talk to him. He certainly doesn't have to answer if he doesn't want to. Well, I think the problem is that he didn't want to, and he didn't answer, and the police officer just kept talking to him without taking the step to say, you're not under arrest, you are free to leave. I think the problem is when I'm saying, or when Mr. Hill's saying, I'm not going to answer the question, and then he just questions him some more, I think that's the problem. And at that time… It might have been annoying, but why is it illegal? Why does it somehow violate the Fourth Amendment or anything else that we should take cognizance of? I think the answer is because we have to consider what a reasonable person would view, and a reasonable person in Mr. Hill's position, I think, would not feel that they could walk away when they… There would not ever be a reasonable person in his position. I understand the point, but I think for purposes of the analysis, we have to look at it and say, well, is there a reasonable person in this position? Are they going to feel free to leave? A reasonable thief, you mean. Well, not necessarily a reasonable thief. A reasonable money launderer, I think, would be the way to go. Either way. Right. Your point is not missed, Your Honor, but I believe that the answer is a reasonable person doesn't feel free to walk away in that circumstance, and the presence of all these people around him, whether they're police or not, the police officer uses that to his benefit, knowing they're there, knowing that's putting Mr. Hill in this position, he then questions him. But, you know, I mean, if we really want to go back to doctrine here, the police officer has received information from the employees of the casino and has no reason to question what they've said, so these are not anonymous informants at all. They're employees of the casino. The police officer, certainly by that time, if you're talking about red money, has a reasonable, articulable suspicion enough to go up and ask him something and even detain him briefly, which is precisely what McKechnie does. And then he starts telling these preposterous stories, which gives McKechnie further reason to continue detaining him, takes him in the other room, the FBI guy comes, and another preposterous story comes along, and by that time they've found the rest of the money anyway with the credit union bans around the bills. It seems to me this was actually pretty straightforward. I think what's confusing about the record and about the district court's opinion here was the district court indicated that the officer, Mr. McKechnie, had information from these casino employees about them having observed Mr. Hill with this red money. That's not what Lieutenant McKechnie testified to, as we indicated in the reply brief. What he admitted during cross-examination was that he didn't recall any employee ever telling him they saw any red money. What they told him, according to him, is that they had heard from some unknown hotel guest that he was doing this, Mr. Hill was doing this. And so his information, McKechnie's information, as he indicated when he testified, was that there was an unknown hotel guest and he was told about that by the casino officials or the casino security people. Now, the casino security person that testified, Ms. Perry, suggested that she told Mr. McKechnie, the officer, about the casino security people or her herself having seen him with this red money. But when I questioned Lieutenant McKechnie, he said now he had no recollection of that. What he was told was about a report from some unknown person, and that's all he knew when he approached Mr. Hill. The district court didn't resolve it this way. I mean, the government recounts on pages 5 and 6 of its brief testimony about this, and we get one person first noticing a problem, then Officer Perry, the casino person, she sees, she hears of the report. She speaks to Faulkner, you know, Faulkner and she chat for a while, and she calls her supervisor, Casper, and then Perry meets with Casper and McKechnie. So we get McKechnie in this situation and brief him about it. So that's the account that the district court believed, even if there was evidence that might have led to a different story in the record. I don't think there's anything in the district court's opinion, if we go back to the actual opinion, that says that the district court found that Perry told McKechnie about the red money having been seen by a casino personnel. I think that was never explicitly decided. What the district court said was there was a combination of all this information being provided, and the district court wrote the opinion as if all of that combined information was known to Officer McKechnie when he approached Mr. Hill. But according to McKechnie's own testimony, which certainly the district court credited, she was not saying that McKechnie was saying anything incorrectly or that he was wrong about anything. If she's going to credit McKechnie, McKechnie says, I didn't know about that. I knew that there was a report on the radio and that Ms. Perry then reiterated the report on the radio about some unknown hotel patron, I'm sorry, hotel casino patron, having seen Mr. Hill doing business. But on top of that, the district court does say, I know you're running out of time, Lieutenant McKechnie testified that he observed red-dyed bills in Hill's hands as he walked in. Anyway, so I think we have your point. Why don't you save a minute? Thank you, Your Honor. I appreciate it. Okay. Mr., how do you pronounce your last name? Perranti? Perranti. Perranti. May it please the court, my name is Chris Perranti and I represent the United States. Judge, just to clarify two things that defense counsel just mentioned. First of all, this wasn't repeated questioning of the defendant. Lieutenant McKechnie asked two questions. He said, why does that money, why is that money dye stained? And two, where did you get it? That's it. There was no badgering of this man. Did he repeat the questions? No, he never, he asked two questions and the record's clear on that. To the first question of why does that money, why does the money have dye stains on it? The defendant didn't respond. He then says, where did you get that money? And the defendant comes up with a ridiculous story. That's when we get the lake story, right? Right. And that was it. That's the extent of the interview in that line. And it's important to note, it wasn't an ominous tip. This, the information was verified by casino personnel. Mr. Faulkner personally went over, the defendant called him over because his money got stuck in the machine. He personally observed the money stuck in the machine. He then told Ms. Perry about it, and he said, I personally observed this man has a large stack of dye stain money. Ms. Perry then went and met with Mr. Casper and Lieutenant McKechnie and conveyed that information. Now, Ms. Perry's testimony is clear at the suppression hearing that she conveyed that information to Lieutenant McKechnie. Lieutenant McKechnie could not recall exactly what was told to him by Ms. Perry, but he said it was consistent with the radio dispatch, which is, we have a gentleman who's sitting at the slot machines. He is feeding large amounts of dye stain money into the machine. He's not playing the game, and he's immediately cashing out for vouchers. Have you ever seen a case like this before? I have not, Judge. I have not, and neither did Lieutenant McKechnie. And neither has the casino personnel that I spoke to in this case. This was very unusual for them, which is exactly why they were spotted. We have seen cases where bank robbers tried to put the dye stain bills in washing machines, which was as close to laundering as you could get. And what's important here is it's so bizarre that when they hear this, that's exactly what you'd want them to do. You'd want them to go, and who is this man, and what is he doing, you know, acting this way? And as Lieutenant McKechnie approaches the defendant, that's when he personally sees the defendant holding a stack of dye stain money, which is still wrapped in the bank band. So he sees into the sack? No, no, it's in his hand. It's not even in the sack. Oh, he's just holding it in his hand. It's in his hand. A bunch of red money. With the bank band. That's called caught red-handed. Exactly, and what's important is Lieutenant McKechnie, a 26-year veteran of the Hammond Police Force, knows about dye stain money, knows that most people don't walk around with a bank band still wrapped around it. And if you take that information, so even if you wanted to believe defense counsel that this was some anonymous tip, well, it's now corroborated, right? The lieutenant has actually seen the defendant holding the stack of money. That's still wrapped in the bank band, waiting in line to exchange this money. So there's certainly at that point enough to detain him as a Terry stop, if not probable cause, and then plus with the two additional answers. How does it stick with probable cause? There's probable cause, and after that is when the rest of this. And the FBI person comes in. He's really Johnny on the spot. He's actually not Johnny on the spot. The FBI person doesn't come in until, unfortunately, later. But how long? I had the impression it wasn't too much time. No, Mr. Hill was actually released that evening, and he's not arrested for a little bit after that. Oh, okay. So not as on the spot as we would like. All right. But as far as the second issue of the cell site, I'll stand on our briefs if defense counsel is not here. So I just have one thing I wanted to talk to you about, the second issue, because what concerns me, and I think perhaps Agent Rashke tried to take care of this in his testimony here as opposed to the earlier case, is that the historical cell tower data really needs to be understood, I think, as a plus or minus sort of thing. There's a cell tower, and if that cell tower picks you up, you're within maybe five miles of the cell tower, and you're not really sure. So if you're trying to use that data to say, you know, were you in Naperville, Illinois, or were you in Springfield, Illinois, great. You know, the margin is fine. But if you're going to ask, were you in Naperville, Illinois, or were you in Westmont, you know, which is right next. I'm a West suburban person, so I know this. Or Downers Grove, or whatever. Maybe it was 20 miles. If it was 20 miles, it would be Westmont. But in other words, there are degrees of precision that the historical cell tower data will not support. And I believe Agent Raschke admitted that, but we want to be careful with it. Absolutely. And this, what I described to the district, was cell site 101. This was not, he didn't even give a radius. Special Agent Raschke just said, he just explained how cell phones work. They connect to the nearest tower, the tower with the strongest signal, which is usually the nearest tower. And here's where Mr. Hill's phone is connected over certain time periods. He never said, this means that Mr. Hill was there. He never said that this means his phone was there. He just explained the technology, and he read the records to show which towers he used that day. And he did testify, did he not, about the range of the towers, or did he not? On cross-examination, it was the defense who actually went into, could it be 20 miles, could it be 15 miles? And he explained the best he could. You know, there's a lot of different factors that go into it. But he never said, on this day for this call, this phone had to be within one mile radius. He never got near that. So it was very general cell site testimony. Right. And my only concern is, did it not be used to prove a proposition that's more precise than that technology would support? Absolutely. And he did not. There's no further questions. We would ask that you affirm the judgment. All right. Thank you. I'll give you a minute, Mr. Brindley. Thank you. With respect to the testimony of Agent McKechnie, or Officer McKechnie, at the suppression hearing, what he said, the information that he had when questioned on cross-examination, he referenced a radio dispatch. And he had earlier mentioned during that same cross-examination that what the radio dispatch was telling him was some unknown casino patron saw this guy with this red money. So I do think it was an anonymous tip when he got to Mr. Hill, at that point, for what he actually knew. I don't think he knew anything, according to his own testimony, which was credited, about what casino personnel saw. However, then the question is, when he sees him holding the red money in his hand, that becomes the pivotal issue. I said that was a pivotal issue at the hearing, and this is why. I think the problem is that, in our view, Mr. Hill was, at that point that he sees the money, he's already being questioned, it's in our view Mr. Hill's already been seized, and that's the problem that requires that the matter be reversed and remanded. So with that, Your Honor, I would request that result. Thank you. All right, thank you very much. Thanks to both counsel. We'll take the case under advisement.